UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

WALTER J. KEMPSTON,

                        Plaintiff,

      -against-                                       5:13-CV-1064 (LEK)

CAROLYN W. COLVIN,
Commissioner of Social Security,

                        Defendant.

---

## MEMORANDUM-DECISION and ORDER

**I. INTRODUCTION**

This case has proceeded in accordance with General Order 18, which sets forth the procedures to be followed in appealing a denial of Social Security benefits. Both parties have filed briefs. Dkt. Nos. 8 ("Plaintiff's Brief"); 9 ("Defendant's Brief"). For the following reasons, the judgment of the Social Security Administration ("SSA") is affirmed.

**II. BACKGROUND**

    **A. Plaintiff's Medical Records**

Plaintiff Walker J. Kempston ("Plaintiff") has a history of health issues including degenerative disk disease of the lower spine, hypertension, chronic obstructive pulmonary disease ("COPD"), non-specific sleep fragmentation, and poor sleep efficiency. See Dkt. No. 6 ("Record") at 20.[1] Plaintiff claims that his medical conditions bar him from all gainful work activity. See R. at 158.

Plaintiff was first treated by Dr. David Barber ("Dr. Barber") at the Phoenix Primary Care

---

[1] Citations to the Record are to the pagination assigned by the SSA.

Center on November 19, 2001 for pain in his lower back caused by lifting chairs. R. at 301. Plaintiff claimed to have a recent flare up of lower back pain and had a twenty-year history of back pain. Id. Dr. Barber noted that Plaintiff was distorted in his back, wore a back brace, and had started physical therapy to relieve the pain. Id. Dr. Barber indicated that an X-ray of Plaintiff's lumbar spine showed L5-S1 spondylolisthesis that he believed to be degenerative. Id. A subsequent MRI showed disk abnormalities that were suggestive of herniation at L3-4. Id. A bulge at L4-5 was also apparent. Id. Dr. Barber also noted that, while Plaintiff was able to walk on his heels and toes and squat without pain, muscle spasms were present and straight leg raises caused pain in his lower back at 70 degrees. Id. Plaintiff's reflexes were normal at the knees and ankles. Id. Dr. Barber diagnosed Plaintiff with discogenic lower back pain and referred him to a specialist. R. at 302.

Plaintiff was treated at A.L. Lee Memorial Hospital by Dr. Anurag Sahai, where he was diagnosed with "poor sleep efficiency and non-specific sleep fragmentation" on October 7, 2007. R. at 227. On December 11, 2007, Plaintiff was treated by Dr. Barber for hypertension and continued fatigue. R. at 277. Dr. Barber prescribed amitriptyline for pain that may have caused sleep disturbances and increased Plaintiff's blood pressure medication due to his elevated blood pressure. Id. Plaintiff returned to Dr. Barber for a follow-up on March 5, 2008, at which time Dr. Barber additionally prescribed hydrochlorothiazide to further treat Plaintiff's hypertension and referred him to a specialist for an opinion on his fatigue. R. at 275-76. Dr. Barber noted Plaintiff was taking Neurontin four times per day for back pain. R. at 275.

Plaintiff was again treated by Dr. Barber on September 15, 2008 for lower back pain. R. at 272. At the time of the appointment, Dr. Barber noted that Petitioner could bend to 30 degrees before his back began to tighten and perform straight leg raises to 70 degrees. Id. Plaintiff's back

2

was not tender and appeared to be fairly straight. Id. Dr. Barber also noted that there appeared to be some muscle spasm in the left para-lumbar muscles. Id. Plaintiff denied having pain radiating down his leg, numbness, or weakness. Id. Dr. Barber diagnosed Plaintiff with lower back strain, and prescribed Flexeril and naproxen. Id.

On December 13, 2010, Dr. Barber evaluated Plaintiff during a preoperative medical examination for cataract surgery. R. at 266. Plaintiff told Dr. Barber that he became short of breath when walking quickly for long distances but was able to walk through the mall, carry groceries, and climb stairs without any difficulties. Id. Plaintiff's blood pressure was mildly elevated. Id. Plaintiff was prescribed tramadol for back pain. R. at 267.

On April 15, 2011, Plaintiff presented to Dr. Edward Southard ("Dr. Southard") for a consultative internal medicine examination per the referral of the Division of Disability Determination. R. at 309. Plaintiff reported a history of lower back pain and a diagnosis of a herniated disk in 2003. Id. He described his pain as an ache that started in his lower back and radiated down his left leg. Id. Plaintiff reported his pain as a 7/10 and stated that he was unable to find a comfortable position via sitting or standing to relieve the pain. Id. Plaintiff stated that he wore a prescribed neoprene back brace at all times for relief. Id. Additionally, Plaintiff reported a history of chronic obstructive pulmonary disease ("COPD"), which caused shortness of breath with minimal exertion and activity and a sensitivity to dust and pollen. Id.

Dr. Southard noted that Plaintiff was able to cook, clean, and do laundry by himself. Plaintiff could also shower, bathe, and dress without difficulty. R. at 310. Upon examination, Dr. Southard determined Plaintiff had a normal gait, walked on heels and toes without difficulty, and could squat fully. Id. Plaintiff was able to rise from a chair without difficulty and needed no help

3

changing for the exam or getting on and off the exam table. Id. Dr. Southard determined that Plaintiff's cervical and lumbar spines showed full flexion, extension, lateral flexion bilaterally, and full rotary movement bilaterally. R. at 311. Additionally, Plaintiff's joints were stable and nontender, and Plaintiff had full range of motion of hips, knees, and ankles. Id. Dr. Southard found an x-ray of Plaintiff's lumbar spine to show degenerative changes. Id. Dr. Southard diagnosed Plaintiff with lower back pain with herniated disk, by history; COPD; and high blood pressure, by history. R. at 312. Ultimately, Dr. Southard determined that Plaintiff's prognosis was good and he showed no limitations with regard to physical activity beyond the need to avoid exposure to respiratory irritants. Id.

Plaintiff had a follow-up appointment with Dr. Barber on August 3, 2011 for hypertension, lower back pain, COPD, and gastroesophageal reflux disease ("GERD"). R. at 355. Dr. Barber noted that Plaintiff could not sit for long periods due to back pain and numbness in his right leg. Id. Plaintiff complained of aching in his hips, knees, and ankles. Id. Upon examination, Plaintiff was able to stand on his heels and toes and bend over to touch the floor. Id. Straight leg raises caused discomfort at 70 degrees, and there was diminished reflex in Plaintiff's right knee and no reflex in his right ankle. Id. Dr. Barber noted there was no tenderness to Plaintiff's back. Id. Plaintiff was referred for MRI scan of his back to determine if any changes had occurred. R. at 356.

On November 11, 2011, Plaintiff was treated by Dr. Barber for lower back pain. R. at 351. Dr. Barber noted that an MRI performed on August 29, 2011 showed disc bulging with mild central canal stenosis and bilateral foraminal narrowing at L3-4 and L4-5, mild bilateral foraminal stenosis at L5-S1, and spondylolisthesis of L5 on S1 secondary to facet degenerative changes. Id. Plaintiff denied any numbness but claimed to have lacerating pain going down his right leg into his foot. Id.

4

Plaintiff claimed that he could not sit for longer than twenty minutes at a time before needing to stand or move about, but was able to stand for longer periods of time, and was not limited in walking except by his COPD when he walked "at a good pace for more than a few blocks." Id. Dr. Barber noted that Plaintiff recently traveled to Florida and obtained pain relief when walking in pools. Id. Upon examination, Plaintiff was able to do straight leg raises to 90 degrees bilaterally and come within a few inches of touching the floor while keeping his legs straight. Id. His reflexes at knees and ankles were normal. Id. Dr. Barber diagnosed Plaintiff with chronic back pain with right sciatica and opined that Plaintiff was permanently disabled due to his need to periodically lie down and change positions. Id.

On the same day, Dr. Barber also completed a medical source statement outlining Plaintiff's limitations from lower back pain with right sciatica and COPD. R. at 318-20. Dr. Barber indicated that he has treated Plaintiff since April 12, 1998 and opined Plaintiff's prognosis as "poor for [a] meaningful recovery." R. at 318. Dr. Barber determined that Plaintiff's limitations where as follows: he could walk two to three city blocks without rest or severe pain; he could sit twenty minutes at one time and less that two hours in an eight hour workday; he could stand thirty minutes at one time and about four hours in an eight hour workday; he would need a job permitting shifting positions at will from sitting, standing, or walking; he would need greater than or equal to six unscheduled breaks during the workday and would need to rest forty-five minutes before returning to work; he could occasionally lift less than ten pounds, but never ten or more pounds; he could rarely twist, but never stoop/bend, crouch/squat, or climb ladders; he could occasionally climb stairs; he would be off task more than twenty percent of the workday; he should avoid even moderate exposure to extreme cold and humidity; and he should avoid all exposure to fumes, odors,

5

dusts, gases, and poor ventilation. R. at 318-20.

On November 14, 2011, Plaintiff treated with Dr. Donna-Ann Thomas ("Dr. D. Thomas") and Dr. Jonathan Pratt ("Dr. Pratt") at Upstate Comprehensive Pain Medicine, per the referral of Dr. Barber, for back pain. R. at 339-41. Plaintiff reported tripping over his right foot. Id. He also stated that he had received transforaminal injections in the past and received two to six months of pain relief from them. Id. On examination, Dr. D. Thomas and Dr. Pratt were able to recreate Plaintiff's pain symptoms with a straight leg raise. R. at 339. Dr. Pratt assessed Plaintiff with radiculopathic nerve damage. R. at 340. Plaintiff was prescribed Mobic and his prescription of Neurontin was increased. Id. He was scheduled for the first available transforaminal nerve injection. Id.

On November 23, 2011, Plaintiff received a right L5 transforaminal steroid injection under the supervision of Dr. P. Sebastian Thomas ("Dr. P. Thomas") at Upstate Comprehensive Pain Medicine. R. at 335-38. Plaintiff's pain was reduced from a 7/10 to a 4/10 within thirty minutes of the procedure. R. at 336-37. Dr. P. Thomas noted that Plaintiff's gait was normal and he could undergo exercise testing or participate in an exercise program. R. at 335.

On May 24, 2012, Plaintiff returned to Dr. P. Thomas with complaints of pain in his lower back and right leg. R. at 331-34. Dr. P. Thomas noted that Plaintiff obtained a 70 percent reduction in pain for about four months following the transforaminal steroid injection on November 23, 2011. Id. Plaintiff stated that the pain had returned to baseline over the two months preceding the May 24, 2012 appointment but denied numbness or tingling. R. at 331. Plaintiff reported that his pain was a 6/10. Id. Dr. P. Thomas noted that Plaintiff's gait was still normal and he could undergo exercise testing or participate in an exercise program. Id.

6

Plaintiff received a second transforaminal nerve root injection on June 14, 2012. R. at 328-30. Dr. P. Thomas noted that the second injection did not provide as much relief as previous injections and that Plaintiff denied falling or tripping. Id. Prior to the procedure, Plaintiff rated his pain as 4/10. Id.

On May 11, 2012, Plaintiff was treated by Dr. Barber for complaints of bilateral knee pain. R. at 349. Plaintiff claimed that his knees hurt when climbing stairs, squating down, or standing from a seated position, but denied any swelling or locking up. Id. Dr. Barber diagnosed Plaintiff with patellofemoral syndrome and opined the cause of knee pain was due to Plaintiff's chronic lower back pain. Id.

During a follow up visit on July 17, 2012 with Dr. Christi Barber ("Dr. C. Barber") regarding his second transforaminal nerve root injection, Plaintiff stated that his pain had improved by fifty percent from prior to the two injections and the aching, sharp pain in his lower back and burning in his leg were "much better." R. at 325. Plaintiff claimed that sitting still exacerbated his pain and the burning in his right leg. Id. Dr. C. Barber refilled Plaintiff's prescription of Neurontin as Plaintiff stated the prescription was working without adverse effects. Id.

Plaintiff received a third transforaminal nerve root injection on July 27, 2012 performed under the observation of Dr. D. Thomas and Dr. Anthony Lebario ("Dr. Lebario"). R. at 321-24. Dr. D. Thomas noted that the previous injection provided Plaintiff with fifty to sixty percent relief for greater than one month. R. at 321. Prior to the procedure, Plaintiff rated his pain as a 5/10 and stated that the pain was located on the right side of his lower back and traveled down his leg. R. at 322. Within thirty minutes of the procedure, Plaintiff reported his pain as a 0/10. Id. Dr. Lebario assessed Plaintiff's lumbar radiculopathy as improved. R. at 323.

On August 21, 2012, Plaintiff was treated by Dr. Barber for dizziness and high blood pressure. R. at 347. Plaintiff reported significant and unchanged lower back pain that traveled down his right leg into his foot, and shortness of breath with exertion. Upon examination, Dr. Barber noted straight leg raises to 90 degrees without pain. Id. Plaintiff was able to bend over and come within a foot of touching the floor and displayed full motor strength. Id. An examination found reflexes in his ankles and right knee to be diminished and a positive Dix-Hallpike result on the right. Id. Plaintiff tolerated the Epley maneuver well, and his back was symmetric and nontender. Id. Dr. Barber diagnosed Plaintiff with uncontrolled hypertension, chronic lower back pain, and right-sided radioculopathy. Id. Dr. Barber completed a medical source statement indicating Plaintiff had the exact same limitations as he had determined on November 11, 2011, and stated "there has been no improvement in condition as evaluated today." R. at 342-45.

### B. Non-Medical Evidence

On August 31, 2012, Shirley Seabury ("Seabury"), Plaintiff's former supervisor at A.L. Lee Memorial Hospital, drafted a letter describing the accommodations Plaintiff received until the Hospital closed in 2009. R. at 218. Seabury stated that "he was able to continue to fulfill the requirements of the job by wearing a back brace, frequently ambulating around the facility, and attending physical therapy as needed." Id. She further indicated that Plaintiff stood or knelt when working at his computer and would leave work early due to back pain. Id.

### C. ALJ Hearing

On or about March 21, 2011, Plaintiff filed an application for disability insurance benefits, alleging disability beginning June 5, 2009 due to a back injury and COPD. R. at 18. The Social Security Administration ("SSA") denied the application on May 11, 2011, and Plaintiff

8

subsequently filed a written request for a hearing before an Administrative Law Judge ("ALJ") on June 30, 2011. R. at 18. On September 11, 2012, ALJ Scott M. Staller conducted a hearing regarding Plaintiff's claim with his counsel and impartial vocational expert ("VE") Karen Simone ("Simone"). R. at 30.

ALJ Staller asked Plaintiff questions related to his work capabilities, current medical state, and daily life activities. R. at 35-42. Plaintiff testified that his last employment position had lasted from 1997 until the facility was ultimately closed in 2009. R. at 36-37. When asked about his back problems, Plaintiff stated that he feels continuous pain through his lower back and when he sits, the pain goes down his right leg into his foot. R. at 37. Plaintiff testified that he is unable to sit and must lay down to perform exercises learned in physical therapy in order to relieve the pain. R. at 37-38. Further, Plaintiff claimed that the pain disrupts his sleep and he is able to sleep three to four hours each night. R. at 38. When asked about his daily routine, Plaintiff testified that he mostly stays inside his house to watch television and read the newspaper while standing or lying down, and also rides his bicycle. R. at 39-40. Plaintiff stated that he no longer bowls or golfs and mainly visits family. R. at 40.

After the ALJ questioning, Plaintiff's counsel further inquired into Plaintiff's medical status and functional capacity. R. at 42-55. Counsel asked about the onset of Plaintiff's back pain and his ability to work. R. at 42-43. Plaintiff testified that his back problems began in 2002 and, due to his senior status at work, he was permitted certain allowances at work, such as flexible hours and access to the physical therapy department, which enabled him to work until 2009. R. at 43-44. Plaintiff claimed he could only sit for approximately fifteen minutes, stand for forty-five minutes to an hour, lift five to ten pounds, and walk for fifteen to twenty minutes. R. at 50-52. Plaintiff stated that he

9

has also experienced balance issues and on a daily basis trips over his right foot. R. at 52. When counsel inquired about Plaintiff's ability to bend, Plaintiff testified that bending and reaching place a lot of strain on his lower back and he is cautious of doing these activities. R. at 52-53. Plaintiff also stated that he does not do housework, but does go grocery shopping with his wife occasionally. R. at 53. Counsel also asked about Plaintiff's ability to concentrate. Id. Plaintiff claimed that he is unable to concentrate for long periods of time due to pain. Id.

VE Simone then testified regarding Plaintiff's prior work experience. R. at 56. Plaintiff had done light work as a purchasing director. Id. Given a residual functional capacity ("RFC") of medium, skilled work in a setting free of concentrated exposure to dust, fumes, gases, odors, poor ventilation, or other pulmonary irritants, VE Simone determined that Plaintiff would be able to perform his past job as a purchasing director. R. at 56. Given a additional hypothetical with an RFC of light and sedentary work with the same restrictions, VE Simone determined that plaintiff would still be able to perform his past job as a purchasing director. R. at 56-57. VE Simone determined that Plaintiff could perform other jobs in the national and state economy such as a procurement clerk. R. at 57-58. Lastly, the ALJ provided a hypothetical with the additional limitation of being off task twenty percent or more of the time, and VE Simone determined that there would be no work available under those circumstances. R. at 58.

### D. The ALJ's Decision

ALJ Scott M. Staller issued a decision denying Plaintiff's application for disability insurance. R. at 18-25. The ALJ found that Plaintiff had not engaged in any substantial gainful activity since June 5, 2009. R. at 20. The ALJ then found that Plaintiff did suffer from the following severe impediments: degenerative disk disease of the lumbar spine, hypertension, COPD,

and non-specific sleep fragmentation and poor sleep efficiency.  Id.  The ALJ did not find that Plaintiff had any impairment, or combination of impairments, that medically equaled the severity of one of the listed impairments in 20 C.F.R. § 404(P), Appendix I.  Id.

The ALJ found that Plaintiff had the RFC to perform medium, skilled work with the exception that he must avoid concentrated exposure to dust, fumes, gases, odors, poor ventilation, or other pulmonary irritants.  R. at 20-21.  Additionally, the ALJ found that Plaintiff could perform past relevant work as a purchasing director.  R. at 25.  This determination was based on the objective, medical records and Plaintiff's ability to perform activities of daily living, such as the ability to walk through the mall, carry groceries, climb stairs, cook, clean, wash laundry, shower, and dress by himself without significant difficulty.  R. at 22.  Plaintiff also showed improvement in functioning with steroid injection treatment and routinely showed negative straight leg raising with an ability to reach towards the ground while keeping his legs straight.  R. at 24.  VE Simone testified that an individual of Plaintiff's age, education, and work experience possessing the same RFC could perform Plaintiff's past relevant work as a purchasing director as actually and generally performed.  R. at 25.  As a result, the ALJ concluded that Plaintiff was not disabled by the standards set forth in the Social Security Act.  R. at 25.

## III. LEGAL STANDARD

### A. Standard of Review

When a court reviews the SSA's final decision, it determines whether the ALJ applied the correct legal standards and if the ALJ's decision is supported by substantial evidence in the record. 42 U.S.C. § 405(g); Roat v. Barnhart, 717 F. Supp. 2d 241, 248 (N.D.N.Y. 2010) (Kahn, J.) (citing Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982)).  Substantial evidence amounts to "more than

a mere scintilla," and the evidence must reasonably support the decision-maker's conclusions. Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)). The Court defers to the Commissioner's decision if it is supported by substantial evidence, "even if it might justifiably have reached a different result upon a *de novo* review." Sixberry v. Colvin, No. 12-CV-1231, 2013 WL 5310209, at *3 (N.D.N.Y. Sept. 20, 2013) (quoting Valente v. Sec'y of Health & Human Servs., 733 F.2d 1037, 1041 (2d Cir. 1984)). However, the Court should not uphold the ALJ's decision when there is substantial evidence to support his decision, but it is not clear that the ALJ applied the correct legal standards. Johnson v. Bowen, 817 F.2d 893, 986 (2d Cir. 1987).

**B. Standard for Benefits**

The regulations established by the SSA define disability as "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a). To receive disability insurance benefits and/or Social Security income, a claimant must satisfy the requirements set forth in the SSA's five-step sequential evaluation process. Id. § 404.1520(a)(1). During this process, the SSA denies the claim if the claimant is determined not to be disabled at any step; if it is not determined whether the claimant is disabled, the SSA will proceed to the next step. Id. § 404.1520(a)(4). The claimant bears the burden of proof in the first four steps; at step five, the burden shifts to the SSA. Kohler v. Astrue, 546 F.3d 260, 265 (2d Cir. 2008) (quoting Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996)).

First, the SSA considers whether the claimant is working and if the work amounts to

"substantial gainful activity." 20 C.F.R. § 404.1520(a)(4)(i). If it does, the claimant is not considered disabled under SSA standards. Id. Second, the SSA considers whether: (1) the claimant has a severe medically determinable physical or mental impairment or combination of impairments, and (2) the impairment or combination of impairments meet the duration requirement. Id. §§ 404.1509, .1520(a)(4)(ii). If he does not have such an impairment, the claimant is not considered disabled. Id. Third, the SSA again considers the severity and duration of the impairment(s) to determine if they meet or exceed one of the listings included in appendix 1. Id. § 404.1520(a)(4)(iii). If a listing is met or exceeded, the SSA movers on to step four to review the claimant's residual functional capacity (RFC) and past relevant work. Id. § 404.1520(a)(4)(iv). The claimant is not disabled under SSA standards if the RFC reveals that the claimant can perform past relevant work. Id. If the claimant cannot perform his past relevant work, the SSA decides at step five whether there is other work that the claimant could perform. Id. § 404.1520(a)(4)(v). If appropriate work does not exist, then the claimant is considered disabled. Id.

## IV. DISCUSSION

Plaintiff argues that: (1) the ALJ failed to provide adequate weight to the opinion of the treating physician, Dr. Barber; (2) the ALJ failed to properly evaluate the statement from the Plaintiff's previous employer, Shirley Seabury, and erred in assessing Plaintiff's credibility; and (3) the ALJ's Step 4 determination is unsupported by substantial evidence because the ALJ relied upon testimony given in response to an incomplete hypothetical question. Pl.'s Br. at 3.

### A. Evidentiary Weight of the Opinion of a Treating Physician

Plaintiff argues that the ALJ failed to properly weigh the opinion of his treating physician, Dr. Barber. See Pl.'s Br. at 12. The regulations established by the SSA assign controlling weight to

the opinion of the treating physician if the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2). Where a treating physician's opinion is not given controlling weight, the SSA regulations require the ALJ to consider a number of factors, including: the length of the treatment relationship and the frequency of examination; the nature and extent of the treatment relationship, including the treatment the source has provided and the kinds and extent of examinations and testing the source has performed or ordered from specialists; evidence in support of the physician's opinion; the opinion of a specialist; and other factors brought to the Commissioner's attention that tend to support or contradict the opinion. Id. § 404.1527(c)(2)-(6). After considering these factors, the ALJ's determination must "comprehensively set forth [his] reasons for the weight assigned the a treating physician's opinion." Burgess v. Astrue, 537 F.3d 117, 129 (2d Cir. 2008) (quoting Halloran, 362 F.3d at 33); see also 20 C.F.R. § 404.1527(c)(2).

The ALJ chose to give little weight to the opinion of the treating physician because Dr. Barber relied heavily on Plaintiff's report of symptoms and limitations rather than his own objective, medical evidence which shows less limiting impairments. R. at 24. This finding was proper. Dr. Barber opined that Plaintiff was likely permanently disabled and limited the Plaintiff to a less than sedentary level of exertion with multiple unscheduled breaks. R. at 317-20. Dr. Barber's opinion was not supported by his own treatment notes, nor did he mention any clinical finding that supported his opinion that Plaintiff was disabled. R. at 317. According to his treatment notes from August 12, 2012, Dr. Barber found some diminished reflexes in Plaintiff's lower extremities and a positive Dix-Hallpike result on the right. R. at 327. However, Dr. Barber determined during multiple examinations that Plaintiff's gait was normal, he was able to walk on his heels and toes,

14

and could squat fully. R. at 272, 301, 351, 355, 374. Plaintiff was routinely able to do negative straight leg raises and reach towards the ground, coming withing one foot of touching the floor, while keeping his legs straight. R. at 347, 351, 355. He also had full motor strength, and a symmetric, nontender back. R. at 272, 347, 355. Despite such minimal objective finding, Dr. Barber concluded that Plaintiff was disabled.

From November 2011 to July 2012, Plaintiff was treated at Upstate Comprehensive Pain Medicine at the referral of Dr. Barber for back pain. During that time, Plaintiff received three transforaminal nerve root injections. Before the first injection, Plaintiff rated his pain as a 7/10; following the injection, as a 4/10. R. at 335-38. The doctor preforming the injection noted that Plaintiff's gait was normal and he was able to undergo exercise testing and/or participate in an exercise program. Id. Before the second injection, Plaintiff rated his pain as a 4/10. R. at 328. Before the third injection, Plaintiff rated his pain as a 5/10; following the injection, as a 0/10. R. at 322. During a follow up consultation, Plaintiff had a normal gait and stated that his pain had improved by fifty percent from prior to receiving the injections. R. at 325. At the appointment for the third injection, Dr. Lebario assessed Plaintiff's lumbar radiculopathy as improved. R. at 323. These records indicate that Plaintiff was receiving pain relief from the injections and tend to contradict the opinion of Dr. Barber.

Dr. Barber's opinion also was not supported by the objective medical findings of Dr. Southard, an orthopedist. Dr. Southard determined that Plaintiff had full motor strength and range of motion, his cervical and lumbar spines showed full flexion and rotary movement, and his joints were non-tender. R. at 310. Plaintiff displayed a normal gait, could walk on heels and toes without difficulty, squat in full, and required no help getting on and off the exam table. His findings

15

indicated that Plaintiff showed no limitations with regard to physical activity. R. at 312.

Additionally, the ALJ relied upon information regarding Plaintiff's daily activities contained in his treatment records. Plaintiff admitted to performing general household activities and independent daily tasks during the period in question. Although Plaintiff testified that he no longer bowled or played golf, on December 13, 2010, he reported to Dr. Barber that, while he became short of breath when he walked "fast for long distances," he was able to walk through the mall, carry groceries, and climb stairs without any difficulties. R. at 266. On April 15, 2011, Plaintiff reported to Dr. Southard that he was able to cook, clean, and do laundry by himself, as well as shower, bath, and dress without difficulty. R. at 310. In November 2011, Dr. Barber noted that Plaintiff had recently visited Florida where he was able to get some relief from his pain by walking in a pool. R. at 351. This information provided by the Plaintiff tends to contradicts the opinion of Dr. Barber that Plaintiff was disabled as he was able to perform activities of daily living.

The SSA regulations state, "We generally give more weight to the opinion of a specialist about medical issues related to his area of specialty than to the opinion of a source who is not a specialist." 20 C.F.R. § 416.927(c)(5). As a specialist in orthopedics, the opinion of Dr. Southard was reasonably given more weight by the ALJ than that of Dr. Barber, a primary physician. See R. at 24. The ALJ properly evaluated all of the relevant evidence in determining that Dr. Barber's opinion was inconsistent with the other substantial evidence in the record and thereby giving Dr. Barber's opinion little weight when making his determination.

### B. The ALJ's Evaluation of Plaintiff's Credibility

The Plaintiff next argues that the ALJ's credibility finding was not supported by substantial evidence. See Pl.'s Br. at 18. Objective medical evidence is used to establish the existence of an

16

impairment which "could reasonably be expected to produce the pain or other symptoms alleged." 42 U.S.C. § 423(d)(5)(A). Once an ALJ has found an underlying medically determinable impairment that could reasonably be expected to produce a claimant's pain and other symptoms, he is required to evaluate the intensity, persistence, or functionally limiting effects of the symptoms. 20 C.F.R. § 404.1529(c); see also Social Security Ruling 96-3P, 1996 WL 374181, at *2 (S.S.A. July 2, 1996). In doing so, the ALJ must consider all available evidence, including objective medical evidence and any information submitted by the claimant, treating or nontreating source, or other persons regarding the claimant's pain or other symptoms. Id.

Plaintiff testified that he began experiencing back pain in 2002 but continued to work until June 5, 2009, when his employer's facility was closed and his position terminated. R. at 37. Plaintiff explained that he was able to work during that time period because his job allowed for workplace adjustments including a flexible schedule, daily access to physical therapy, and the option to walk or kneel throughout the day to alleviate his back pain. R. at 43. Plaintiff reported that he could stand for forty-five minutes to an hour before needing to lie down. R. at 50-51. He could walk for fifteen to twenty minutes and sit for fifteen minutes before needing to stop. Id. Plaintiff testified that he would have difficulty lifting five to ten pounds throughout a workday and noted some balance and bending issues. R. at 51-52. Additionally, Plaintiff testified that he experiences shortness of breath due to COPD, uncontrolled hypertension at times, and sleep problems associated with his pain. R. at 38.

The ALJ reviewed all relevant records and determined that Plaintiff's statements concerning the intensity, persistence, and limiting effects of the symptoms were not credible. In making this determination, the ALJ first considered Plaintiff's medical history. In addition to the chronic lower

17

back pain as previously discussed, the record documents a history of hypertension, COPD, and sleep difficulties prior to the alleged onset date. In 2007, Plaintiff was diagnosed with poor sleep efficiency and non-specific sleep fragmentation during a sleep study. R. at 227. Additionally, Plaintiff had been treated for hypertension and mild COPD. In April 2011, Dr. Southard determined that Plaintiff should avoid exposure to respiratory irritants secondary to his COPD. R. at 312.

Second, the ALJ reasonably considered Plaintiff's ability to perform activities of daily living, as discussed in the previous section. Third, the ALJ also considered the statement provided by Plaintiff's previous employer, Shirley Seabury, which described the work accommodations provided to Plaintiff. R. at 218. Although the letter did provide insight into Plaintiff's functioning, the ALJ reasonably found that Ms. Seabury's assessment of the Plaintiff's limitations to be inconsistent with the objective medical evidence.

Given the objective medical evidence, the ALJ properly evaluated the statement from Plaintiff's previous employer and reasonably determined that Plaintiff's statements concerning the intensity, persistence, and limiting effects of the symptoms were not credible. Plaintiff's statements regarding the intensity, persistence, and limiting effects of the symptoms were inconsistent with the objective evidence contained in the record. Additionally, Plaintiff's testimony was inconsistent with his reports to doctors as he stated he was able to perform activities of daily living, such as walking through the mall and carrying in groceries.

**C. The ALJ's Step 4 Determination and Substantial Evidence**

Lastly, the Plaintiff argues that the ALJ's determination regarding the Plaintiff's ability to preform past relevant work was unsupported because the ALJ relied on the testimony of VE Simone in response to an incomplete hypothetical question. See Pl.'s Br. at 21-22. As part of the evaluation

process, a claimant's RFC must be determined before applying step four of the disability benefits test. A claimant's RFC represents that individual's ability to sustain physical and mental work activities despite the limitations placed on him due to his impairments. 20 C.F.R. § 416.945(a)(1). The RFC is determined by the ALJ's consideration of all of the claimant's impairments and all relevant medical and other evidence. The fourth step of the sequential evaluation process places the burden on the claimant to show that he was unable to preform his past relevant work. An individual retains the capacity to perform his past relevant work when he can perform the functional demands and duties of the job as he actually performed in or as generally required by employers throughout the national economy. Social Security Ruling 82-61, 1982 WL 31387, at *2 (S.S.A. Jan. 1, 1982); see also Jock v. Harris, 651 F.2d 133, 135 (2d Cir. 1981).

The ALJ reasonably determined upon examination of the record that Plaintiff had the RFC to preform medium work due to his environmental limitations and shortness of breath secondary to his COPD. R. at 20-21, 321. Because the Plaintiff was found to have an RFC to preform medium work, the ALJ ultimately determined he would therefore be able to perform light or sedentary work at the least. Id. VE Simone testified that work as a purchasing director was sedentary work as generally performed in the national economy, but light work as it was specifically performed by Plaintiff. R. at 56. See Vol. I U.S. Department of Labor's Dictionary of Occupational Titles (DOT), 106 (4th ed. 1991), http://www.oalj.dol.gov/public/dot/references/dot01d.htm. Thus, Plaintiff would still be able to perform the duties required of a purchasing director and not be considered disabled.

Despite this, Plaintiff claims that the ALJ relied upon testimony given in response by VE Simone to an incomplete hypothetical question in making his determination. See Pl.'s Br. at 1.

Plaintiff argues that the ALJ should have included in his hypothetical limitations related to lifting, twisting, stooping, the need for breaks, and diminished attention and concentration. Pl.'s Br. 22-23. However, the ALJ never determined that Plaintiff had such limitations.

In conclusion, the ALJ was correct in his determination of Plaintiff's RFC because he reasonably evaluated all of the relevant evidence and his RFC determination is supported by substantial evidence in the record. See 20 C.F.R. § 416.945(a).

## V. CONCLUSION

Accordingly, it is hereby:

**ORDERED**, that decision of the Commissioner is **AFFIRMED**; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Memorandum-Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

DATED: September 29, 2015
Albany, New York

Lawrence E. Kahn
U.S. District Judge